**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**CARTER VINCENT ANDERSON**                                    **CIVIL ACTION**

**VERSUS**                                                                   **NO. 18-7977**

**DARREL VANNOY, WARDEN**                               **SECTION: "I"(5)**

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Carter Anderson, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On March 21, 2011, Anderson was charged by bill of information with armed robbery and being a convicted felon in possession

of a firearm.[1]    On November 15, 2012, a jury found him guilty as charged.[2]    His motions for post-verdict judgment of acquittal and new trial were denied.    On February 4, 2013, the trial court sentenced him to 60 years at hard labor with the first 20 years to be served without benefit of probation, parole or suspension of sentence, and 10 years at hard labor without benefit of probation, parole or suspension of sentence, respectively.[3]    His motion to reconsider the sentence was denied.    The State filed a multiple bill of information.[4]    On April 16, 2013, his original sentences were vacated, and the trial court sentenced him as a third-felony offender to life imprisonment on each count, to run concurrently.

Anderson appealed and asserted one claim of error.    He argued that the trial court erred in denying his motion to suppress his confession.    On February 18, 2014, the Louisiana First Circuit Court of Appeal affirmed the convictions and sentences.[5]    He filed an application for writ of certiorari with the Louisiana Supreme Court.    On October 24, 2014, the Louisiana Supreme Court denied his writ application.[6]

---

[1]  State Rec., Vol. 1 of 7, Bill of Information, 22nd JDC for St. Tammany Parish.

[2]  State Rec., Vol. 1 of 7, Minute Entry, 11/15/12.

[3]  State Rec., Vol. 1 of 7, Minute Entry, 2/4/13.

[4]  State Rec., Vol. 1 of 7, Multiple Offender Bill of Information.

[5]  *State v. Anderson*, 2013-KA-0836, 2014 WL 647913 (La. App. 1st Cir. 2/18/14); State Rec., Vol. 4 of 7.

[6]  *State v. Anderson*, 2014-KO-0591 (La. 2014), 151 So.3d 599; State Rec., Vol. 3 of 7.

On December 28, 2015, Anderson submitted an application for post-conviction relief to the state district court.[7]    In that application, he asserted the following claims:    (1) the prosecution purposefully excluded all African-American prospective jurors, rendering his trial fundamentally unfair; (2) prosecutorial misconduct rendered his trial fundamentally unfair; and (3) he was denied the right to effective assistance of appellate counsel for failing to raise a *Batson* claim on direct appeal.    On July 20, 2016, the district court denied relief.[8] On October 17, 2016, his related writ application with the Louisiana First Circuit was denied.[9]    On August 3, 2018, the Louisiana Supreme Court denied his application for supervisory writs.[10]    The Louisiana Supreme Court concluded that Anderson failed to show that he received ineffective assistance of counsel under *Strickland* and that he failed to satisfy his burden of proof as to the remaining claims.

During the time he was seeking supervisory relief from the post-conviction ruling with the appellate courts, Anderson also submitted to the state district court a motion to vacate an illegal habitual-offender sentence.[11]    In that motion, he argued that his

---

[7]  State Rec., Vol. 4 of 7, R.p. 619, Uniform Application for Post-Conviction Relief.

[8]  State Rec., Vol. 4 of 7, R.p. 708, District Court Ruling denying PCR, 7/20/16.

[9]  State Rec., Vol. 5 of 7, *State v. Anderson*, 2016-KW-1048, 2016 WL 6092938 (La. App. 1st Cir. Oct. 17, 2016).

[10]  State Rec., Vol. 6 of 7, *State ex rel. Anderson v. State*, 2016-KH-2137 (La. 2018), 249 So.3d 822.

[11]  State Rec., Vol. 4 of 7, Motion to Vacate an Illegal Habitual Offender Sentence signed

adjudication and enhanced sentence as a third-felony offender was the result of an impermissible double enhancement, because the underlying offense the State used to charge him as a convicted felon in possession of a firearm was also used to have him adjudicated as a third-felony offender.    On June 7, 2017, the trial court denied the motion to vacate because it was untimely, successive and the sentence had been reviewed on appeal.[12]    On August 21, 2017, his timely filed supervisory writ application was denied by the Louisiana First Circuit without stated reasons.[13]    On August 3, 2018, the Louisiana Supreme Court issued a one-word denial of his related supervisory writ application.[14]

On August 20, 2018, Anderson filed a federal application for relief in this Court.    In that application, he raises the following combined five grounds for relief asserted on direct appeal and collateral review:    (1) the trial court erroneously denied the motion to suppress his confession; (2) the trial court erred in overruling his *Batson* challenge to the prosecutor's use of peremptory challenges to remove the only three prospective African-American jurors; (3) ineffective assistance of appellate counsel in failing to assert the *Batson* claim on direct appeal; (4) the prosecutor engaged in misconduct by presenting a case based on speculation

---

and dated 6/1/17.

[12]    State Rec., Vol. 4 of 7, R.pp. 757-60, Ruling Denying Motion to Vacate, 6/7/17.

[13]    State Rec., Vol. 7 of 7, R.p. 1230, *State v. Anderson*, 2017-KW-0865, 2017 WL 6603954 (La. App. 1st Cir. Aug. 21, 2017).

[14]    State Rec., Vol. 7 of 7, *State ex rel. Anderson v. State*, 2017-KH-1530 (La. 2018), 250 So.3d 888.

and hearsay unsupported by any tangible evidence; and (5) the enhanced sentence is the result of an impermissible double enhancement. [15]    In its response to the federal application, the State does not allege untimeliness, failure to exhaust, or procedural default.[16] Anderson submitted a Reply to the State's Response.[17]

**Facts**

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts adduced at trial as follows:

> On December 30, 2010, between midnight and 1:00 a.m., Larry Bennett (the victim) was in a Wal–Mart parking lot in Slidell, Louisiana, when an African–American male approached his 1993 Cadillac Seville. The victim, a retired truck driver from Toledo, Ohio, who came to Slidell to purchase a part for his antique airplane, was set to spend the night in his vehicle when the perpetrator suddenly smashed his rear window. When the victim turned towards the back, the perpetrator pointed a gun at the victim's face and told him to get out of the car. When the victim attempted to take the keys out of the ignition, the perpetrator told him to leave the keys in the ignition and get out of the car, and he began striking the victim in the back of his head. Before fleeing the scene in the victim's vehicle, the perpetrator forced the victim to place a blanket that was in his vehicle over his head, as blood from his head injury began to cover his neck. John Binder, a bystander who was in the Wal–Mart parking lot at the time, witnessed the robbery and contacted the police. Binder described the perpetrator as a short, African–American male with dreadlocks. The victim was taken to Ochsner Hospital where he received stitches in the back of his head.
>
> After being released from the hospital, the victim provided the Slidell Police Department (SPD) with the telephone number for the cell phone that he left in

---

[15]  Rec. Doc. 3, Petition.

[16]  Rec. Doc. 12.

[17]  Rec. Doc. 14.

the vehicle and with the clothing that he was wearing at the time of the incident. The police accessed the cell phone records and determined that the cell phone was used to call Laura Bolden. Bolden was defendant's girlfriend, with whom he was living at the time in a duplex apartment building at the corner of 11th Street and Cousin Street in Slidell. The victim's vehicle was recovered from an apartment complex within walking distance of the residence. SPD Detectives Daniel Suzeneaux [18] and Brian Brown observed surveillance footage [19] from the apartment complex showing that, shortly after the robbery, the vehicle was dropped off by an individual who fit the description provided by Binder. The victim's cell phone was found at the residence on Cousin Street, and defendant and the others who were present at the residence were asked to come to the police station for questioning. Defendant, before being questioned, initially denied any knowledge or involvement. Defendant was advised of his *Miranda* rights at the scene and again at the police station where a waiver of rights form was executed. Defendant made incriminating statements during an audio-recorded interview at the police station. SPD executed a search warrant for Bolden's vehicle that was at the residence on Cousin Street and found a bag containing a handgun and a traffic ticket in defendant's name. The victim's DNA was found during the testing of swabs processed from the recovered handgun. Defendant fit the basic description depicted on the surveillance footage and given by Binder; however, at the time of his arrest he had a short haircut with remaining twists, as opposed to full dreadlocks. During the audio-recorded interview, defendant admitted that his girlfriend recently styled his hair in dreadlocks, but due to the "good" texture of his hair he could not maintain the locks. During the trial, the victim identified defendant as the perpetrator, noting that he was able to focus on the perpetrator's eyes and nose as the gun was being held between the perpetrator's face and the victim's face.[20]

---

[18]   The detective's name is alternatively spelled as "Seuzeneau" in the record.

[19]   The apartment manager had limited knowledge on the operation of the surveillance system. After the police viewed the surveillance footage, they unsuccessfully attempted to download the footage.

[20]   *State v. Anderson*, 2013-KA-0836, 2014 WL 647913, at *1 (La. App. 1st Cir. 2/18/14) (footnotes in original).

**Standards of Review on the Merits**

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court

confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 572 U.S. 415, 426 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents." *Id.* at 102 (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable

8

decisions of state courts.").

**Claims for Relief**

I.    Admission of Involuntary Confession

Anderson claims that the trial court improperly denied the motion to suppress his statement.    He asserts that his confession was involuntary and coerced with threats, promises and falsehoods.    The confession was audio-recorded.    The compact disc recordings and executed statements regarding his *Miranda* rights were introduced as evidence at the suppression hearing and submitted as part of the instant state-court record.[21]

The Louisiana First Circuit rejected the claim on direct appeal as follows:

> In his sole assignment of error, defendant argues that the trial court erred in denying his motion to suppress his confession. He asserts that detectives threatened him and his girlfriend in order to get him to incriminate himself. Defendant contends that there was no eyewitness identification or DNA evidence linking him to the armed robbery offense. Defendant argues that the convictions should be reversed due to the police's use of coercion, threats, and promises to induce the confession. Defendant contends that the trial court should have granted the motion to suppress after hearing the detectives threatening him on the recording. Defendant notes that he was not the only person who had access to the vehicle and further contends that the police investigation was faulty because they lost evidence and they failed to identify the owner of the items seized from the vehicle that was searched. Defendant contends that he emotionally collapsed under the notion that his girlfriend could be falsely accused of this crime. Defendant notes that the detectives lied about his fingerprints being found in the victim's vehicle and about having a witness who already identified defendant as the perpetrator. Defendant also claims that the detectives promised to help his girlfriend, knowing that they intended to prosecute her.

The Fourth Amendment to the United States Constitution and article I, § 5 of

---

[21]   Rec. Doc. 12-2, Notice of Manual Attachment, Exhibit 2.

the Louisiana Constitution protect persons against unreasonable searches and seizures. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. LSA–C.Cr.P. art. 703A. The State bears the burden of proving the admissibility of a purported confession or any evidence seized during a search without a warrant. LSA–C.Cr.P. art. 703D. Louisiana Revised Statute 15:451 provides that before a purported confession can be introduced in evidence, it must be affirmatively shown to be free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. It must also be established that an accused who makes a confession during custodial interrogation was first advised of his or her *Miranda* rights. *State v. Plain*, 99–1112 (La. App. 1 Cir. 2/18/00), 752 So .2d 337, 342. The State must specifically rebut a defendant's specific allegations of police misconduct in eliciting a confession. *State v. Thomas*, 461 So.2d 1253, 1256 (La. App. 1 Cir. 1984), *writ denied*, 464 So.2d 1375 (La.1985).

Whether a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. *State v. Benoit*, 440 So.2d 129, 131 (La. 1983). The trial court must consider the totality of the circumstances in deciding whether a confession is admissible. *State v. Hernandez*, 432 So.2d 350, 352 (La. App. 1 Cir.1983). Testimony of the interviewing police officer alone may be sufficient to prove a defendant's statements were freely and voluntarily given. *State v. Maten*, 04–1718 (La. App. 1 Cir. 3/24/05), 899 So.2d 711, 721, *writ denied*, 05–1570 (La. 1/27/06), 922 So.2d 544.

A trial court's ruling on a motion to suppress the evidence is entitled to great weight, because the court had the opportunity to observe the witnesses and weigh the credibility of their testimony. *State v. Jones*, 01–0908 (La. App. 1 Cir. 11/8/02), 835 So.2d 703, 706, *writ denied*, 02–2989 (La. 4/21/03), 841 So.2d 791. Correspondingly, when a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence. *See State v. Green*, 94–0887 (La. 5/22/95), 655 So.2d 272, 280–81. However, a trial court's legal findings are subject to a de novo standard of review. *See State v. Hunt*, 09–1589 (La. 12/1/09), 25 So.3d 746, 751. When reviewing a trial court's ruling on a motion to suppress, the entire record may be considered, including trial testimony. *State v. Martin*, 595 So.2d 592, 596 (La. 1992).

The following evidence was presented at the hearing on the motion to suppress. Detective Suzeneaux testified that everyone present at the duplex apartment on the day of the robbery, including defendant, was asked to come to the station for questioning regarding the robbery, and everyone agreed. After Bolden was interviewed, Detective Suzeneaux and SPD Detective Luke Irwin interviewed defendant. Detective Suzeneaux denied that defendant was coerced or forced into making a statement at the hearing and again during the trial.

The audio-recorded interview revealed that defendant's rights were read to him, and he stated that he understood his rights and further stated that he wished to make a statement. Defendant denied that he had been physically or verbally abused and confirmed that he was making the statement of his own free will. Defendant initially denied having specific information regarding, or being involved in, the robbery. He implicated his male roommate before eventually making incriminating statements that pointed to his personal involvement, but he did not initially make a full-blown confession. The police relayed some of the information that they had regarding the offense and admittedly used falsehoods. For example, the police indicated that they already knew what happened and that they had fingerprint evidence and witness statements implicating defendant. Vulgar language was also used along with repeated requests for truth, honesty, and details. The police also told defendant that he was not helping himself by lying and that he was being given the chance to tell the truth. Defendant eventually admitted to handling the gun, having personal contact with the stolen vehicle, and knowing that it had been stolen. Defendant ultimately stated that he hit the victim out of fear. The police informed defendant that if he continued to cooperate they would let his cooperation be known. The police reminded defendant that his child and girlfriend loved him and that defendant may have committed the offense for them, as they continued to question defendant. Before defendant finally confessed, he again admitted that he was not being forced to make the statements. Defendant's emotional breakdown came after he confessed and became even more concerned about the consequences of his actions.

As to the voluntariness of defendant's statements, we note that the police testimony indicated that there were no promises or abuse to induce defendant's agreement to make a statement, and defendant indicated as such during the interview. As noted, defendant was fully advised of his rights and executed a waiver of rights form. We note that statements by the police to a

defendant that he would be better off if he cooperated are not promises or inducements designed to extract a confession. *State v. Lavalais*, 95–0320 (La. 11/25/96), 685 So.2d 1048, 1053, *cert. denied*, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997). A confession is not rendered inadmissible by the fact that law enforcement officers exhort or adjure a defendant to tell the truth, provided the exhortation is not accompanied by an inducement in the nature of a threat or one which implies a promise of reward. Further, a defendant's confession is not inadmissible merely because in making it he may have been motivated by a desire to protect his girlfriend. *See State v. Lee*, 577 So.2d 134, 143–44 (La. App. 1 Cir.), *writ denied,* 580 So.2d 667 (La. 1991); *State v. Weinberg*, 364 So.2d 964, 969–71 (La. 1978); *State v. Brown*, 504 So.2d 1025, 1031 (La. App. 1 Cir.), *writ denied*, 507 So.2d 225 (La. 1987). As did the Louisiana Supreme Court in *Lavalais*, we find in this case that, rather than being promises or inducements designed to extract a confession, the comments in question herein were more likely musings not much beyond what this defendant might well have concluded for himself. *Lavalais*, 685 So.2d at 1053–54. The totality of the interview clearly conveys that the statements were not being made according to any promises, coercion, or threats.

Regarding certain falsehoods used by the police during questioning, the issue is whether or not such tactics were sufficient to make an otherwise voluntary confession or statement inadmissible. *See State v. Lockhart*, 629 So.2d 1195, 1204 (La. App. 1 Cir. 1993), *writ denied*, 94–0050 (La. 4/7/94), 635 So.2d 1132. In *Lockhart*, a detective misled the defendant into believing that the police knew more about the case than they really did by telling him that the victims had identified him. Another detective stated that he would inform the district attorney's office that the defendant contended the shootings were accidental. This court found that the detectives' statements to the defendant were not sufficient inducements "to make an otherwise voluntary confession inadmissible." *Lockhart*, 629 So.2d at 1204. Similarly, in *State v. Sanford*, 569 So.2d 147, 150–52 (La. App. 1 Cir.1990), *writ denied*, 623 So.2d 1299 (La. 1993), this court determined that a defendant's confession was not rendered involuntary, although the detective apparently misled the defendant into believing that one of his cohorts had confessed by informing him that the other suspects were "singing like birds." *Sanford*, 569 So.2d at 151.

We have carefully reviewed the evidence presented at the suppression hearing and at trial and conclude that the lower court's ruling is supported by the record. While the officers admittedly utilized confrontational language, defendant, who had a criminal record, seemed to be more concerned about his

> realization that he was a multiple offender and admitted to being terrified in
> that regard. We find that the totality of the circumstances surrounding the
> making of the confession by defendant and his responses as a whole show that
> the confession was made freely and voluntarily. Considering the above, we
> further find that the trial court did not err or abuse its discretion in denying
> the motion to suppress. The assignment of error is without merit.

The Louisiana Supreme Court likewise denied relief.

The admissibility of a confession is a mixed question of law and fact. *Miller v. Fenton*, 474 U.S. 104, 112 (1985); *ShisInday v. Quarterman*, 511 F.3d 514, 522 (5th Cir. 2007) (citing *Miller*, 474 U.S. at 112). On federal habeas review, this Court must determine if the state court's ruling on voluntariness was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998). If the underlying facts as determined by the state court indicate the presence of some coercive tactic, the impact that factor had on the voluntariness of the confession is a matter for independent federal determination and is ultimately a legal determination. *Miller*, 474 U.S. at 117, 106 S.Ct. 445; *ShisInday*, 511 F.3d at 522.

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), a statement made by a person in custody is inadmissible unless that person was informed that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Id*. at 444-45. Waiver or relinquishment of these rights must be knowing and voluntary, that is, made with full awareness of the nature of the right being waived, and not the result of intimidation, coercion or deception. *Moran v.*

*Burbine*, 475 U.S. 412, 421 (1986).    The court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."    *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

"Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession."    *United States v. Blake*, 481 Fed. Appx. 961, 962 (5th Cir. 2012) (citing *Colorado v. Connelly*, 479 U.S. 157, 163–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)).   In the absence of evidence of official coercion, a defendant cannot establish that his confession was involuntary.    *Carter v. Johnson*, 131 F.3d 452, 462-63 (5th Cir. 1997).

The United States Seventh Circuit Court of Appeals recently reviewed Supreme Court precedent regarding psychological interrogation tactics and coercion:

> Interrogation tactics short of physical force can amount to coercion. The Court has condemned tactics designed to exhaust suspects physically and mentally. Such tactics include long interrogation sessions or prolonged detention paired with repeated but relatively short questioning. *Davis v. North Carolina*, 384 U.S. 737, 752, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (finding coercive the practice of repeated interrogations over sixteen days while the suspect was being held incommunicado).

> The Supreme Court has not found that police tactics not involving physical or mental exhaustion taken alone were sufficient to show involuntariness. In several cases, the Court has held that officers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff. *See, e.g., Procunier v. Atchley*, 400 U.S. 446, 453–54, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971) (suspect was deceived into confessing to false friend to obtain insurance payout to children and stepchildren); *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (deceiving suspect about another suspect's confession). False promises to a suspect have similarly not been seen as *per se* coercion, at least if they are not

quite specific. *See Arizona v. Fulminante*, 499 U.S. 279, 285, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (rejecting language in *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), stating that a confession could not be obtained by "any direct or implied promises," *id.* at 542–43, 18 S.Ct. 183, but finding promise to protect suspect from threatened violence by others rendered confession involuntary); Welsh S. White, *Confessions Induced by Broken Government Promises*, 43 Duke L.J. 947, 953 (1994).

False promises may be evidence of involuntariness, at least when paired with more coercive practices or especially vulnerable defendants as part of the totality of the circumstances. *E.g., Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (pre–*Miranda* confession found involuntary based on false promise of leniency to indigent mother with young children, combined with threats to remove her children and to terminate welfare benefits, along with other factors). But the Supreme Court allows police interrogators to tell a suspect that "a cooperative attitude" would be to his benefit. *Fare v. Michael C.*, 442 U.S. 707, 727, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (reversing finding that confession was involuntary). Supreme Court precedents do not draw bright lines on this subject.

*Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017).    Similarly, the United States Fifth

Circuit Court of Appeals has analyzed instances of alleged coercive conduct in varying

contexts:

Such conduct includes official overreach and direct coercion, as well as promises and inducements. See *United States v. Blake*, 481 Fed. Appx. 961, 962 (5th Cir. 2012) (unpublished) (per curiam). Trickery or deceit only constitutes coercion "to the extent [the defendant is deprived] of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Hopkins*, 325 F.3d at 584. "Neither mere emotionalism and confusion, nor mere trickery will alone necessarily invalidate a confession." *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992) (internal quotations marks omitted). For instance, this Court found that coercion occurred when a defendant confessed to a murder after being assured by police that the conversation was confidential. *Hopkins*, 325 F.3d at 584–85. The defendant had been isolated for fifteen days and was even interviewed by a close friend in order to help elicit a confession. *Id.* at 584. Likewise, coercion was found when a mother confessed only after police threatened to cut off her state

financial aid and take custody of her children. *Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

*Byrom v. Epps*, 518 Fed. Appx. 243, 256-57 (5th Cir. 2013).    In *Byrom*, the Fifth Circuit

acknowledged that officers used deception and cajoling, but rejected the assertion that the

confessions were coerced, reasoning:

> Having reviewed the transcripts of these interviews, it is clear that Byrom's confessions were not coerced. While the sheriff's statements were certainly intended to cajole Byrom into confessing using her emotions and a measure of deception, they did not constitute coercion. Byrom first implicated herself after the sheriff implored Byrom to not leave Junior "hanging out there to bite the big bullet." The sheriff made that statement early during the interview, after a series of denials from Byrom. While the statement certainly suggested that Junior was facing serious legal consequences regarding Edward's murder, the police did not make any threats, promises, or other coercive statements. Insofar as the sheriff made other, subsequent statements, Byrom had already confessed and continued to do so. In any event, Byrom was not promised leniency and she was not threatened in any capacity. The sheriff merely utilized an appeal to emotion and urged her to confess to spare Junior harsher legal consequences, a permissible tactic since Byrom was not thereby deprived of knowledge essential to an understanding of her rights and the consequences of waiving them.    *Hopkins*, 325 F.3d at 584.[22]

---

[22]  The Fifth Circuit reviewed the claim in the context of the following statements:

At the beginning of her second interview, the sheriff told Byrom that [her son] Junior had already confessed and warned Byrom against letting Junior bear the full weight of Edward's murder on his own: "He's already given us a statement on this. Don't let him be out here by himself on this." The sheriff reiterated the point later when he told Byrom that she was "trying to leave him out there by himself." The sheriff also told Byrom that she and Junior would be in danger as long as the triggerman remained free. Finally, the sheriff warned Byrom that he would tell the judge whether and to what extent Byrom cooperated: "There are [sic] stuff you are leaving out here. Now I'm going to tell you. Once we get to the point where we have to talk to the Judge and everything. All that's going to matter. He's going to ask me how did she cooperate? ... Well I'm gonna have to tell him that you had a memory lapse on some 'stuff,' we had to pick it out of her. Now the Judge ain't going to like it." Byrom claims that these statements deceived her and exploited her emotions, thereby constituting

*Id.* at 257-58.

Anderson does not dispute that his rights were read to him and that he stated he understood those rights and wished to make a statement.    However, he asserts that the confession was involuntary because his will was overborne by police misconduct.    *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)).    He contends the police used a variety of coercive tactics to compel an involuntary confession.    First, he argues that police intentionally misled him by telling him they had witnesses and physical evidence that pointed to Anderson as the perpetrator of the armed robbery when no such evidence existed.[23]    Second, he asserts that the police threatened to charge his girlfriend and take her child away if he did not confess and implied they would help her if he did confess.

Here, the Louisiana First Circuit considered the totality of the circumstances, which included not only the pressure and tactics used by police, but also Anderson's personal characteristics, including his familiarity with the criminal justice system.    *Schneckloth v. Bustamonte*, 412 U.S. at 226.    Quite the opposite of being vulnerable, Anderson had prior convictions for which he served time in prison and knew precisely how the criminal justice system worked.    His admitted fear was going back to jail for "life" and not the officers'

_____

coercion that tainted her subsequent confessions.    *Id.* at 257-58.

[23]    Detective Suzeneaux admitted during trial that they told him some things during the interview that were false.    *See* State Rec., Vol. 1 of 7, Transcript, pp. 114-122.

interrogation tactics.    He already knew that his girlfriend, who had come to the station with him, was being questioned by police regarding her involvement in the crime and could face possible charges.    He signed the form stating he understood his *Miranda* rights and wanted to talk to detectives.

Detectives Suzeneaux and Irwin interviewed Anderson at the station.    During the first part of the interview, detectives urged Anderson to cooperate and tell the truth about Vinny, who was Anderson's roommate and a potential suspect at the time.    They said generally they could not help him unless he was truthful about what happened.    They truthfully told him that the focus of the investigation was not on him, but on Vinny—at that time.    Their statements that they did not care about Anderson's involvement were hardly promises of leniency.    In fact, they informed him they did possess information and had recovered a gun that could potentially implicate Anderson, if not for the armed robbery, then for being an accessory after the fact.    Clearly, based on information received thus far, however, they believed Vinny committed the armed robbery and believed Anderson was simply covering for Vinny.    They hoped to get Anderson to cooperate and give them information about Vinny and suggested he had limited time in which to do so.

Anderson repeatedly expressed fear of going back to jail, not fear of the police or Vinny, which explained his withholding information and not being candid with police. Detectives falsely indicated they had his fingerprints on the gun and his girlfriend's car where they found the gun and that other people had witnessed what happened.    Still,

18

Anderson maintained his innocence and offered explanations for the information they had. In doing so, he retreated somewhat from his position that he knew absolutely nothing about Vinny's activity that night and provided more details about what he suspected Vinny had done.

The second part of the interview was conducted after detectives shifted their focus to Anderson, because they learned Vinny's physique did not match the individual they viewed on surveillance.    At this point, detectives began suggesting that he may not have meant to hurt the victim and that he committed the crime to support his girlfriend and daughter, who loved him.    Anderson agreed he did not intend to hurt the victim.    He told the detectives that the guy jumped up and scared him when he hit the window.    He also told detectives how he acquired the gun he used.    The detectives continued to express that if he cooperated they would make his cooperation known.    Anderson once again acknowledged that he understood his *Miranda* rights and had not been forced to make the statement.    He stated that he was going to jail regardless, and the detectives "didn't even make me, I'm sinking myself on tape."    After this point in the interview, when he realizes, "I'm gone," then he became more emotional.

Detectives pressed him about other robberies that he may have been involved in and suggested he could clear his conscience, but he remained skeptical that they could help him out since he doubted they were going to let him just leave.    Detectives candidly informed him he was going to be charged, but they could relay to the District Attorney that he was a

good and remorseful person who deserved another chance.    In an appeal to his sympathy, the detectives told him to think about his loving girlfriend and little girl, who he would be saving from having her mom go to prison.

Later, in the context of the other suspected robberies, detectives told him they had enough to charge his girlfriend as an accessory after the fact and promised to leave her alone if he started talking.    By this time, however, he had already confessed to the armed robbery at issue.    He steadfastly refused to confess to one of the two additional robberies they were questioning him about, despite the detective's admitted use of the "bargaining chip."

The state court's decision finding the police conduct did not render his confession involuntary is neither contrary to Supreme Court precedent nor an unreasonable application of federal law.    Anderson understood his rights surrounding the statement and agreed to speak to the police.    He does not claim that he was impaired in any way when he gave the statement.    The interview was somewhat confrontational, but not unduly long.    He was not young or new to the criminal justice system.    He had multiple prior arrests and experience with law enforcement and understood his waiver and the consequences of his statements.    *See, e.g.*, *Lord v. Duckworth*, 29 F.3d 1216, 1222 (7th Cir. 1994) (identifying the fact that "[a]t the time of his interrogation, [defendant] was 35 years old and had experience with the criminal justice system by virtue of two prior felony convictions" as one of several factors that led to the conclusion that defendant's confession was voluntary).

Anderson was not forced, threatened or otherwise induced to give a confession.

The deception surrounding the available evidence implicating him and alleged promises or threats made by detectives do not constitute evidence of improper or overbearing coercion on the part of the police sufficient to render his confession involuntary.    The existence of a promise constitutes but one factor in the totality of the circumstances analysis and does not render a confession involuntary *per se*.    *United States v. Fernandes*, 285 Fed. Appx. 119, 124 (5th Cir. 2008) (citing *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir. 1988)). Detectives made no explicit promises to Anderson regarding leniency or involving his girlfriend to induce his confession to the armed robbery at issue.    *Byrom*, 518 Fed. Appx. at 257-58.    By the time officers sought to use a "bargaining chip," concerning his girlfriend, in an attempt to gain additional information about other robberies, he had already made the relevant incriminating statements concerning the crime of conviction.

Additionally, encouraging a suspect to tell the truth or telling him that his cooperation will be made known does not suffice to render a subsequent incriminating statement involuntary.    *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) (citations omitted).    The officers' comments to this effect during the interview did not rise to the level of coercion so as to render his statement involuntary.    Similarly, "trickery or deceit is only prohibited to the extent that it deprives the defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *United States v. Bell*, 367 F.3d 452, 461 (5th Cir. 2004) (citing *inter alia, Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002) (en banc)).    Anderson's repeated remarks throughout the

interview indicated that he was never deprived of the ability to understand his rights or the consequences he faced for voluntarily abandoning them.

The appeals to his emotion and sympathy for his girlfriend, who also voluntarily submitted to questioning, were not overtly coercive.    He clearly cared for and wanted to help his girlfriend avoid consequences for the crime he committed.    His comments that he is "gone regardless," but he was "not going to take her down or my little girl down" reflect this concern.    It does not appear at any point during the interview that he was so distraught that his will was overborne.    Under the totality of the circumstances, the comments and statements made by detectives were not so coercive as to overcome Anderson's will to resist. Accordingly, he is not entitled to habeas relief on this claim.

II.    Discriminatory Jury Selection and Ineffective Assistance of Appellate Counsel

Anderson claims that he was denied the right to a fair and impartial jury.    He argues that the prosecution impermissibly used peremptory challenges to remove the only three African-American prospective jurors from the venire in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986).    In a related claim, he asserts that counsel on direct appeal was ineffective for failing to raise the claim of purposeful discrimination under *Batson*.    These claims were rejected on collateral review by the state courts without any stated reasons.[24]

---

[24] Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.' " *Harrington*, 562 U.S. at 100.

In the first venire panel of 20 jurors, the State used five of its peremptory challenges to exclude two white male jurors, No. 289 and No. 168, and three African-American female jurors, No. 324, No. 290 and No. 180.[25]    The defense raised a *Batson* challenge based on the removal of the only three African-American jurors.    The trial court agreed that a prima facie showing was made considering three minority members had been struck and required that the prosecutor provide race-neutral reasons for the peremptory challenges.    The prosecutor stated that he struck Juror No. 324 because when the trial judge asked if jury service would create a problem for anyone, she replied "I'm not going to get paid," which suggested to him a lack of focus and desire to be elsewhere.    He struck Juror No. 290 because she stated she was an emotional decision-maker who rated herself a 3 out of 10 for wanting to serve on the jury and said she does not like having to decide someone's fate, all of which showed she did not want to take part in the process.    Finally, he struck Juror No. 180 due to her comment that she believes innocent people are convicted of crimes based on mistaken identity or being in the wrong place at the wrong time.    She explained her comment by stating, "because everybody says they look the same."[26]    The trial court accepted those reasons, specifically commenting only on Juror Nos. 324 and 290, adding that No. 290 also indicated she had difficulty and concerns with weapons, and denied the

---

[25]  State Rec., Vol. 1 of 7, Transcript, p. 159 (first venire panel). *See also*, Minute Entry, 11/13/12.

[26]  State Rec., Vol. 1 of 7, Trial Transcript, p. 201-202.

defense's *Batson* challenge.    The defense asked the trial court to note an objection for the record.[27]

In *Batson*, the Supreme Court held that purposeful racial discrimination in the use of peremptory strikes of prospective jurors violates the Equal Protection Clause.    *Batson v. Kentucky*, 476 U.S. at 89.    The United States Supreme Court has established a three-step analysis for a *Batson* challenge:

> A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. 476 U.S. at 96-97, 106 S.Ct. 1712. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. *Id.*, at 97-98, 106 S.Ct. 1712. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible;" so long as the reason is not inherently discriminatory, it suffices. *Purkett v. Elem*, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per curiam*). Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, *supra*, at 98, 106 S.Ct. 1712; *Miller-El v. Dretke*, 545 U.S. [231, 251-52], 125 S.Ct. 2317, 2331-32, 162 L.Ed.2d 196 (2005). This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, *supra*, at 768, 115 S.Ct. 1769.

*Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006); *accord Stevens v. Epps*, 618 F.3d 489, 492 (5th Cir. 2010).

Anderson's arguments focus on the second and third *Batson* steps.    With respect to

---

[27]  State Rec., Vol. 1 of 7, Trial Transcript, pp. 221-24.

step two, "[a] neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror.    At this step of the inquiry, the issue is the *facial validity* of the prosecutor's explanation.    Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (emphasis added).    Anderson contends the prosecutor's asserted race-neutral excuses were unfounded.    However, at this step, the Court need not weigh plausibility or persuasiveness, but only facial validity.    Here, the prosecutor's stated reasons for striking the three jurors were facially neutral and not inherently discriminatory.    When questioning began, Juror No. 324 expressed immediate concern about not being paid and raised serious questions about whether she could or would focus on the trial.    Similarly, Juror No. 290's responses demonstrated she did not want to serve or decide an individual's fate.    And Juror No. 180 expressed skepticism for eyewitness identifications.

Anderson faults the trial court's evaluation at the third step primarily because the record was silent as to the weight the trial court afforded the State's reasons for striking Juror No. 180.    A state court's finding under *Batson's* third step is a factual determination and must be reviewed under the AEDPA's specific and highly deferential standard of review applicable to such determinations.    As the Supreme Court has explained:

> Under AEDPA, ... a federal habeas court must find the state-court conclusion "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Thus, a federal habeas court can only grant [the petitioner's] petition if it was unreasonable to credit

> the prosecutor's race-neutral explanations for the *Batson* challenge. State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by "clear and convincing evidence." § 2254(e)(1).

*Rice*, 546 U.S. at 338-39 (2006); *accord Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016) (*Batson's* third step "turns on factual determinations, and, in the absence of exceptional circumstances, we defer to state court factual findings unless we conclude that they are clearly erroneous." (quotation marks omitted)); *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005) ("A state trial court's finding of the absence of discriminatory intent is a pure issue of fact that is accorded great deference and will not be overturned unless clearly erroneous." (quotation marks omitted)). Therefore, even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, ... on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice*, 546 U.S. at 341-42; *accord Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

The record of voir dire shows that the prosecutor first offered specific reasons for striking each of the three jurors. The defense was given an opportunity to respond. Defense counsel did so only with respect to Juror No. 324, stating that although she initially expressed concern about losing money, she did not indicate that she was unwilling to serve or would suffer a financial hardship; thus, it was not a legitimate race-neutral excuse. The trial court then ruled as follows:

> The Court has viewed each of these parties that were struck by the State. [Juror No. 324], when she made that comment about the fact that she would not be paid, seemed very concerned about that.
>
> Juror 290 did indicate that she would not want to decide someone's face [sic] fate. She also indicated she had difficulty with weapons. And had concerns about weapons. The Court feels that the race neutral reasons given by the State are reasonable in their decision making.    And is going to deny the Batson challenge.[28]

In evaluating whether the defense had carried its burden of proving purposeful discrimination at this third step, the trial court offered a brief synopsis that directly addressed the defense's contention about Juror 324 and noted an additional reason not raised by the prosecution for Juror No. 290.    As the record demonstrates, the trial court expressly stated that it had viewed each of the parties struck even if it then specifically commented on only two of the jurors.

However, Anderson argues that the trial judge did not comply with *Batson* because it failed specifically to discuss Juror No. 180 in its ruling.    He also suggests that the trial court avoided the issue because of the racially charged explanation given by Juror No. 180 for doubting witness identifications.    Anderson implies that the trial court did not evaluate or weigh the prosecutor's explanation to "determine if the State was being intentionally discriminatory" with respect to Juror No. 180, because the scrutiny afforded that particular race-neutral reason was not expressed on the record.

Anderson fails to cite any Supreme Court precedent that requires express factual

---

[28]   State Rec., Vol. 1 of 7, Transcript, p. 223.

reasons supporting the trial court's evaluation of each stricken juror at this third step.     *See*, *e.g.*, *Perez v. Smith*, 791 F. Supp.2d 291, 309-10 (E.D.N.Y. 2011) (third step requires determining whether the prosecution's race-neutral explanations are credible, but no specific incantation is required in doing so) (citing *McKinney v. Artuz*, 326 F.3d 87, 100 (2d Cir. 2003) and *Hernandez*, 500 U.S. at 357 n. 2, 111 S.Ct. 1859).     Nor has such a requirement been recognized by the United States Fifth Circuit Court of Appeals:

> [T]here is no requirement in this circuit that a district court make explicit factual findings during *Batson's* third step. Indeed, "a district court may make 'implicit' findings while performing the *Batson* analysis." *United States v. McDaniel*, 436 Fed. Appx. 399, 405 (5th Cir. 2011) (unpublished) (collecting cases).    A recent panel of this court explicitly rejected such a requirement, even when the only race-neutral reason advanced was a demeanor-based reason not otherwise reviewable based on the record.    *See Thompson*, 735 F.3d at 300–01.    Although some other courts disagree, failure to make explicit factual findings on the third step is not itself reversible error. *See Higgins v. Cain*, 720 F.3d 255, 268 (5th Cir. 2013) (noting a circuit split on "whether a trial judge must make explicit findings of fact at *Batson's* third step").

*United States v. Ongaga*, 820 F.3d 152, 166 (5th Cir. 2016) (compliance with the third step of the *Batson* analysis was adequately shown where the district court implicitly found that the government's strike was not purposefully discriminatory).

To the extent Anderson argues that the state-court decision involved an unreasonable application of *Batson* because no third-step analysis occurred for one of the stricken jurors, the claim fails.     *See* 28 U.S.C. § 2254(d)(1).    As the Fifth Circuit noted, there is disagreement among the circuit courts regarding the specificity required for step three of the *Batson* analysis, which certainly highlights the absence of any "clearly established federal

law as determined by the United States Supreme Court." *See Miller v. Colson*, 694 F.3d 691, 698 (6th Cir. 2012) ("a disagreement among the circuit courts is evidence that a certain matter of federal law is not clearly established."). The mere existence of the circuit court split on the issue supports a finding that the determination under *Batson* by the state courts in this case is one upon which "fairminded jurists" could disagree. *Harrington*, 562 U.S. at 101. In light of the split among circuit courts and the lack of Supreme Court precedent on the specific issue presented here, Anderson cannot show that the state court unreasonably applied "clearly established Federal law." 28 U.S.C. § 2254(d)(1).

To the extent he claims that given the evidence presented the state court unreasonably determined that the prosecutor offered legitimate racially neutral reasons for striking the three venirepersons, that claim also fails. Based on the state trial court's own observations and for the additional reasons expressed, the trial court credited the race-neutral reasons proffered by the State as legitimate reasons for striking the jurors. The determination on the issue of discriminatory intent was based on all the facts and circumstances available, and that determination is entitled to great deference. The record reasonably supports that finding in this case. Here, the trial court's ruling was based on the statements by the jurors and the implications those statements had on the criminal trial. At the outset, Juror No. 324 seemed disinclined to jury service for monetary reasons. Juror No. 290 feared weapons and expressed reluctance in serving on the jury and deciding a person's fate in an armed robbery trial. Juror No. 180 was skeptical of eyewitness

identification of black persons in general, and the State bore the critical burden of proving

the identity of the perpetrator in this case with weak identification evidence.    Anderson's

own subjective doubt in the veracity of the reasons hardly proves that the peremptory

challenges were pretextual.[29]    The record in this case supports the trial court's crediting

the proffered race-neutral reasons and finding no discriminatory motive behind the

peremptory strikes.    For these reasons, Anderson is not entitled to habeas corpus relief on

his *Batson* claim.

In a related claim, Anderson asserts that he received ineffective assistance of counsel

on appeal because his appointed counsel failed to assert the *Batson* claim.    The United

States Supreme Court has established a two-prong test for evaluating ineffective-assistance-

of-counsel claims.    Specifically, a petitioner seeking relief must demonstrate that counsel's

performance was deficient and that the deficient performance prejudiced his defense.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).    To

prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that

counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth

Amendment.    *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001).    To prove prejudice

with respect to a claim that appellate counsel was ineffective, a petitioner must show a

reasonable probability that he would have prevailed on appeal but for his counsel's deficient

---

[29]  Anderson fails to identify any individual on the jury who expressed issues similar
to the stricken venire members.

representation. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001); *see also Smith v. Robbins*, 528 U.S. 259, 286, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error. *Briseno*, 274 F.3d at 210.

Appellate counsel need not "urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)." *West v. Johnson*, 92 F.3d 1385, 1396 (5th Cir. 1996). Indeed, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Far from evidencing ineffectiveness, an appellate counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions." *Id*. at 753, 103 S.Ct. 3308. The salient question is whether the issue ignored by appellate counsel was "clearly stronger" than the issues raised on appeal. *See*, *e.g*., *Diaz v. Quarterman*, 228 Fed. Appx. 417, 427 (5th Cir. 2007); *accord Smith v. Robbins*, 528 U.S. at 288. For the reasons thoroughly addressed above in relation to his suppression and *Batson* claims for relief, Anderson has not shown that his *Batson* claim was "clearly stronger" than the suppression issue presented on appeal and, therefore, his ineffective assistance of appellate counsel claim necessarily fails.

III.    Prosecutorial Misconduct

Anderson claims that the prosecutor knowingly presented false testimony from detectives regarding so-called "elusive" physical evidence that was not preserved and could not be produced, in violation of his due-process right to a fair trial.    Anderson's theory is that because the prosecutor knew from the start that he lacked the physical evidence linking Anderson to the armed robbery, he built the case instead around false testimony from detectives and a coerced confession from Anderson.    Specifically, he alleges:

> [T]he State wrangled a conviction without the evidence that was supposedly obtained and some that was allegedly viewed by investigators. The State's alleged "evidence" was never presented to the jury and over Anderson's trial counsel's objection, the State was allowed to present a case based on speculation and hearsay. As a result, Anderson was denied his constitutional right to a fair and impartial trial because the court allowed the State to circumvent justice by presenting its theory to the jury unsupported by any tangible evidence.[30]

He contends that "had the police really discovered evidence that could have proven Anderson was the perpetrator they would have found a way to preserve it."[31]    Thus, he argues that the State should have been precluded from "mentioning any alleged evidence that was not preserved for the defense or jury to inspect."[32]

---

[30]  Rec. Doc. 3, p. 48.

[31]  Rec. Doc. 3, p. 59.

[32]  Rec. Doc. 3, p. 49.    The defense unsuccessfully raised objections based on the missing evidence.    The defense's pretrial motion in limine to prohibit testimony regarding any missing items of evidence was denied.    State Rec., Vol. 1 of 7 (Transcript November 12,

Anderson argues that the State allowed Detective Chadwick to lie when he testified that Vincent Navarre was not the primary suspect at the beginning of the investigation, and the primary suspect was Anderson.    In support, he notes the conflicting testimony given by Detective Suzeneaux and Detective Chadwick regarding whether each believed Anderson was the primary suspect from the start of the investigation.[33]    He also argues that the State improperly elicited false testimony about alleged missing items of evidence related to the vehicle search, including photographs taken of items in Bolden's vehicle and a traffic ticket allegedly found in the car.    He asserts that the State elicited improper testimony from Detective Suzeneaux regarding surveillance video recordings, which the police watched but admittedly did not preserve as evidence.    He maintains that Detective Suzeneaux testified falsely that Anderson ran and hid when they knocked on the door to the apartment when he could not actually "see through walls or the door."[34]

A state denies a defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected.    *Napue v. Illinois*, 360 U.S. 264, 269, 79

---

2012), pp. 103-06.    The trial court also overruled the defense's hearsay objection at trial regarding testimony about the surveillance recording.    State Rec., Vol. 2 of 7, Trial Transcript, pp. 347-49.    Although he criticizes the rulings on hearsay, he has not raised a specific claim on those grounds; the claim presented involves alleged prosecutorial misconduct for presenting false testimony and failing to preserve evidence.

[33] State Rec., Vol. 2, Trial Transcript, p. 325 (Chadwick) and pp. 352-53, 360-61 (Suzeneaux).

[34] Rec. Doc. 3, p. 59.

S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996).    To obtain relief, the defendant must show that (1) the testimony was actually false, (2) the State knew the testimony was false, and (3) the testimony was material.    *Duncan v. Cockrell*, 70 Fed. Appx. 741, 744-45 (5th Cir. 2003).

Anderson has not presented any evidence of perjured testimony or shown that the prosecutor knowingly permitted officers to perjure themselves.    The fact that the detectives in this case offered differing opinions as to the primary suspect of their investigation does not establish that the testimony was false or that the prosecution knew or believed that testimony to be false.    *See Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002); *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (holding that conflicting testimony does not prove perjury but instead establishes a credibility question for the jury).    The mere existence of a conflict in testimony and evidence does not make it false or perjured. *See United States v. Wall*, 389 F.3d 457, 473 (5th Cir. 2004), *cert. denied*, 544 U.S. 978, 125 S.Ct. 1874, 161 L.Ed.2d 730 (2005) ("Wall has not established that McDowell's testimony was actually false. He has merely shown that Ristau's testimony would establish a conflict in the testimony, a far cry from showing that it was 'actually false.' ").    The differing opinions present only a credibility question and disputed issue concerning the appropriate weight to be afforded to the evidence, which frequently occurs at trial and lies within the province of the jury to resolve.

Nor does the mere fact that the evidence was lost or missing establish that the

testimony regarding that evidence is false or that the prosecutor knew the testimony was false.    Here, the officers admitted they failed to follow up on the surveillance video and obtain a copy of the recording.    Detective Suzeneaux candidly explained that despite their efforts, it was impossible at the time of viewing due to unfamiliarity with the technology and the rapidly unfolding investigation demanding their immediate attention, and they regretfully, in hindsight, did not return to secure the evidence that seemed less important once Anderson confessed to the crime.    The detectives could not explain why the traffic ticket and photographs they had collected were missing from the evidence.    While the missing evidence raises an issue as to the weight to be afforded the testimony, the absence of the evidence does not conclusively establish that the testimony was false.    The defense conducted a thorough cross-examination on these issues and squarely presented the credibility issue to the jury to resolve.    To create a reasonable doubt as to Anderson's guilt, defense counsel highlighted the missing evidence during closing argument.    The jury was entitled to find the testimony credible or to reject the testimony given the absence of the demonstrative evidence to support it.    There is simply no record evidence in this case to suggest the testimony was false or that the prosecutor knew it was false.

Finally, Anderson fails to establish that Detective Suzeneaux testified falsely concerning Anderson's hiding from officers.    His testimony reflects his impression, based on the statements made by the other individuals in the apartment and the fact that Anderson was found in a different room, that Anderson fled to some other part of the residence when

they knocked on the door.[35]    On the record presented, Anderson has not shown that the State knowingly elicited false testimony from the detectives.

Furthermore, to the extent he asserts that the prosecutor withheld evidence from the defense, he has never alleged that the material was exculpatory or favorable to the defense.[36] Indeed he maintains it was material to the State's case.    Furthermore, the State informed the defense at the outset that it did not possess the items of evidence and therefore could not produce them as requested in discovery.[37]    The prosecution immediately notified defense counsel when it recovered a copy of the videotape from Wal-Mart's parking lot, but the State had no other evidence in its possession to turn over to the defense.

Due process requires that the prosecution disclose exculpatory evidence within its possession.    *Brady v. Maryland*, 373 U.S. 83, 87 (1963).    There are three components of a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."    *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004).    In this case, for the reasons expressed, Anderson plainly could not establish a *Brady* claim, even

---

[35]    State Rec., Vol. 2 of 7, Trial Transcript, p. 351.

[36]    Rec. Doc. 3, pp. 48-49. He appears to contemplate that *Brady* does not apply here, but in an abundance of caution, the Court discusses briefly the possibility of such a claim.

[37]    State Rec., Vol. 1 of 7, Transcript (November 12, 2012), p. 102.

if he raised such grounds for relief.    *See Brady*, 373 U.S. at 87; *United States v. McClure*, No. 90-5001, 1990 WL 180122, at *3 (4th Cir. Nov. 21, 1990) (affirming district court ruling that evidence was not *Brady* material in part because "the government did not possess the tape" and noting that merely "reviewing the evidence had not amounted to taking possession" of it).

To the extent he suggests a due process violation resulted from the failure to preserve evidence, he fares no better.    A failure to preserve evidence violates a defendant's right to due process if the unavailable evidence possessed "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."    *California v. Trombetta*, 467 U.S. 479, 489 (1984).    A defendant must also demonstrate that the police acted in bad faith in failing to preserve the potentially useful evidence.    *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).    The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed.    *Youngblood*, 488 U.S. at 56-57 n. *.

Anderson has presented no evidence of bad faith on the part of the police in failing to retrieve and preserve the surveillance video.    As part of their investigation, officers viewed the surveillance, but could only glean the physique and general build of the individual from the grainy, unclear footage.    They did not return afterward to secure a copy of the surveillance recording, which did not appear helpful to Anderson in any event.    Nor was

there any suggestion of bad faith in losing track of the ticket found in the vehicle or the photographs of the vehicle and items.    No explanation was offered for why the traffic ticket and photographs were missing from the evidence collected; however, if anything, Anderson benefitted more by the absence of the evidence than he would have had the evidence been preserved and introduced at trial.[38]    He has never suggested that it had any exculpatory value.    Furthermore, Anderson has not alleged that deputies failed to retrieve the video or responsibly preserve the traffic ticket and photographs because of "official animus" or a "conscious effort to suppress exculpatory evidence."    *Trombetta*, 467 U.S. at 488.    As explained above, although the officers knew the items of evidence existed, there is no evidence to suggest that they had reason to believe that any of the items held any evidentiary value favorable to Anderson.    At worst, the failure to retrieve the video and loss of evidence collected may be described as a sloppy or negligent investigation, but mere negligence in failing to preserve evidence is inadequate to show bad faith.    *See Youngblood*, 488 U.S. at 58.

Accordingly, the state courts' denial of relief of this claim was not contrary to, or an unreasonable application of, federal law.    Thus, Anderson is not entitled to relief on this claim.

IV.    Double Jeopardy – Habitual-Offender Adjudication

Anderson asserts that his habitual-offender adjudication violates double jeopardy

---

[38]    *See, e.g.*, State Rec., Vol. 2 of 7, Trial Transcript (Defense Closing Argument), p. 436.

because the underlying felony conviction used to charge him as a convicted felon in possession of a firearm in this case was also used to support the multiple-offender adjudication and sentence he received.    Thus, he contends that his "adjudication and enhanced sentencing as a third felony offender under La. R.S. 15:529.1 is the result of an impermissible double enhancement."[39]    The state courts denied the claim on collateral review of his motion to vacate an illegal sentence.[40]

Here, Anderson appears to argue that the State used his previous 2005 convictions for possession of cocaine and for being a convicted felon in possession of a firearm to support the current charge of being a convicted felon in possession of a firearm, and then used the same firearm conviction as part of the multiple bill of information charging him as a third-felony offender.    He contends that the state sought multiple enhancement of his sentence based on the same set of prior convictions.    However, the bill of information reflects that only the prior 2005 conviction for possession of cocaine was used for count two (possession of a firearm by a convicted felon), *see State v. Anderson*, 2014 WL 647913, at *1 n. 1, whereas the multiple bill of information listed the underlying predicate convictions as the 2004 simple burglary of an inhabited dwelling and 2005 convicted felon in possession of a firearm.

---

[39] Rec. Doc. 3, p. 69.

[40] Although the state district court (and presumably the higher courts) denied the claim on procedural grounds, the validity of which Anderson disputes, the Court will conduct a *de novo* review of the claim on the merits (as briefed by the State), without discussion of any potential procedural default, because no such defense was raised in these federal proceedings.

Furthermore, the United States Supreme Court has historically held that double jeopardy protections do not apply to sentencing proceedings.    *Monge v. California*, 524 U.S. 721, 727 (1992) (citing *Bullington v. Missouri*, 451 U.S. 430, 438 (1981) and *Nichols v. United States*, 511 U.S. 738, 747 (1994)).    Specifically, the Supreme Court held in *Monge* that an enhanced sentence is simply a heightened penalty for a habitual offender's latest conviction, not a second punishment for the prior offense.    *Monge*, 524 U.S. at 727 (citing *Gryger v. Burke*, 334 U.S. 728, 732 (1948) and *Moore v. Missouri*, 159 U.S. 673, 678 (1895)); *see also Dolliole v. Kent*, Civ. Action 17-9655, 2018 WL 2977233, at *6 (E.D. La. May 14, 2018), *adopted*, 2018 WL 2970875 (E.D. La. June 13, 2018).    Thus, for the reasons expressed, Anderson has not established a double jeopardy violation resulted under the circumstances. He is not entitled to relief on this claim.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Anderson's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United*

*Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[41]

New Orleans, Louisiana, this __26th__ day of _____ April _____,
2019.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[41] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.